1
2
3
4
5

Lisa S. Kantor (SBN: 110678)
lkantor@kantorlaw.net
J. David Oswalt (SBN: 73439)
doswalt@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272

6
7
8
9
10
11
12

Kathryn M. Trepinski (SBN: 118378)
ktrepinski@trepinskilaw.com
LAW OFFICES OF KATHRYN M. TREPINSKI
A Law Corporation
8840 Wilshire Boulevard, Suite 333
Beverly Hills, California 90211
Telephone: (310) 201-0022
Facsimile:  (866) 201-2251

Attorneys for Plaintiff Ian Moura,
on behalf of himself and all others
similarly situated

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886.2525

13
14
15
16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17 IAN MOURA, on behalf of himself and all others similarly situated,<br><br>18<br><br>19                        Plaintiff,<br><br>20            vs.<br><br>21<br>22 KAISER FOUNDATION HEALTH PLAN, INC.,<br>23                        Defendant.<br>24<br>25<br>26 | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR:**<br><br>**BREACH OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PREJUDGMENT AND POSTJUDGMENT INTEREST; ATTORNEYS' FEES AND COSTS** |

27
28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1       Plaintiff Ian Moura, on behalf of himself and all others similarly situated, herein

2   complains of Kaiser Foundation Health Plan, Inc. (hereinafter "Kaiser"), as follows:

3

4                                **INTRODUCTION**

5       1.      Plaintiff Ian Moura is 29 years old.  He suffers with anorexia nervosa.

6   Approximately 20 million women and 10 million men suffer from a clinically

7   significant eating disorder at some time in their life.  Eating disorders are the third

8   most common chronic illness among adolescents, and the incidence of eating disorders

9   in the United States has doubled since the 1960s.  Eating disorders have the highest

10  mortality rate of any mental illness, in excess of twenty percent.  They can lead to

11  medical complications including cardiac arrhythmia, heart failure, kidney stones and

12  kidney failure, cognitive impairment, osteoporosis, constipation, electrolyte imbalance,

13  muscle atrophy, amenorrhea, teeth erosion, irritation and tears of the throat, esophagus

14  and stomach, emetic toxicity, infertility and death.  Suicide, depression and severe

15  anxiety are common side effects throughout the illness and treatment.

16      2.      Eating disorders are treatable.  They can be fully and successfully treated

17  to remission, though only ten percent of those suffering from an eating disorder receive

18  treatment.  In this case, Kaiser wrongfully denied Plaintiff's claim for treatment for his

19  eating disorder.  As explained below, Kaiser engages in a pattern and practice of

20  behavior which results in the violation of plan terms, violation of ERISA and its

21  implementing regulations, and violation of the California Mental Health Parity Act and

22  the Federal Mental Health Parity Act.  Kaiser also fails to comply with the California

23  Unruh Civil Rights Act and the California Medical Practices Act (also known as the

24  Corporate Practice of Medicine Doctrine).

25                      **The California Mental Health Parity Act**

26      3.      Under California's Mental Health Parity Act ("Parity Act"), health

27  insurers must provide all medically necessary treatment for patients suffering from a

28  severe mental illness on the same financial terms and conditions (e.g., co-payments,

deductibles and lifetime maximums) as for physical illnesses.  The Parity Act was enacted in 1999, after the Legislature found that:

      a)    Mental illness is real.

      b)    Mental illness can be reliably diagnosed.

      c)    Mental illness is treatable.

      d)    The treatment of mental illness is cost effective.[1]

The Legislature further found that most private health insurance policies had, until then, provided coverage for mental illnesses at levels far below coverage for physical illnesses; that limitations in coverage for mental illness in private insurance plans had resulted in inadequate treatment; that inadequate treatment had caused "relapse and untold suffering for individuals with mental illnesses and their families;" and that inadequate treatment for mental illness "had contributed significantly to homelessness, involvement with the criminal justice system, and other significant social problems." To remedy this disparity, the Parity Act mandates broad coverage for "Severe Mental Illnesses," including anorexia and bulimia.[2]  The Parity Act is codified at California Insurance Code section 10144.5 and Health and Safety Code section 1374.72.

## The Unruh Civil Rights Act

4.    The Unruh Civil Rights Act prohibits a "business establishment," including health plans, from discriminating against "persons" based on, among other things, any "disability" or "medical condition."  The Unruh Act bars insurers from imposing restrictions on benefits for patients who suffer from Severe Mental Illness, that are not imposed on other patients, because of their mental "disability" or "medical condition."  The Unruh Act is codified at California Civil Code section 51.  It

---

[1] 1999 Cal. Legis. Serv. ch. 534 (A.B. 88).

[2] The other Severe Mental Illnesses covered by the Parity Act are schizophrenia, schizoaffective disorder, bipolar disorder, major depressive disorder, panic disorder, obsessive-compulsive disorder, and pervasive developmental disorder of children including autism.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

mandates a minimum penalty of $4,000 per violation, or three times the amount of actual damage.

### The California Medical Practices Act
### (The Corporate Practice of Medicine Doctrine)

5.     The California Medical Practices Act states that corporations and other artificial entities, such as health plans, "shall have no professional rights, privileges or powers." This policy is broadly applied to prevent unlicensed persons and entities from interfering with or influencing a physician's independent professional judgment. Examples of some types of behaviors and subtle controls that the corporate practice doctrine is intended to prevent include:

a)     Determining what diagnostic tests are appropriate for a particular condition.

b)     Determining the need for referrals to, or consultation with, another physician/specialist.

c)     Responsibility for the ultimate overall care of the patient, including treatment options available to the patient.

d)     Operating a business that offers patient evaluation, diagnosis, care and/or treatment.

e)     Influencing decisions regarding coding and billing procedures for patient care services.

6.     Health Maintenance Organizations ("HMOs"), such as the plan at issue in this case, fall within the scope of the Medical Practices Act. The prohibition of the corporate practice of medicine is codified at California Business & Professions Code sections 2400 and 2052.

### The Federal Mental Health Parity Act

7.     The Federal Mental Health Parity and Addiction Equity Act ("MHPAEA") requires health care plans issued by employers with more than 50 employees that choose to provide mental health benefits to cover them, as written and

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

applied, in parity with medical/surgical benefits.   Separate cumulative financial requirements (e.g., annual or lifetime dollar limits), or "nonquantitative" limitations in mental health treatment (e.g., caps on number of visits or days of treatment), are not permitted under the Act.  Plans, such as  Plaintiff's, that classify care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits must likewise treat any covered care in residential treatment facilities for mental health.  Final Rules Under the Paul Wellstone and Pete Dominici Mental Health Parity and Addiction Equity Act of 2008 ("Final Rules"), p. 68247.

## GENERAL ALLEGATIONS

8.   This action is brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), as it involves claims for employee benefits under employee benefit health plans regulated and governed under ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question.

9.   This action is brought for the purpose of obtaining benefits under the terms of employee benefit health plans, enforcing Plaintiff's rights under the terms of such plans, clarifying Plaintiff's rights to future benefits under such plans, and obtaining injunctive and declaratory relief regarding the administration of such plans. Plaintiff seeks relief, including but not limited to: payment of benefits, declaratory and injunctive relief clarifying how claims should be administered, prejudgment and post-judgment interest, and attorneys' fees and costs.

10.   This action seeks to represent the named plaintiff and all individuals who were covered under group health plans underwritten and/or administered in the State of California by Kaiser.  The proposed class only includes persons who were covered under plans regulated by ERISA.

11.   Plaintiff Ian Matthew Moura was at all times relevant a resident of Sunnyvale, California. On February 19, 2016, Plaintiff legally changed his name and gender from Matthea McCracken Moura (female) to Ian Matthew Moura (male).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   Plaintiffs, including Mr. Moura, were at all times covered beneficiaries under

2   employee benefit health plans underwritten and/or administered by Kaiser in the State

3   of California and regulated by ERISA.

4          12.    Defendant Kaiser is, and at all relevant times was, a corporation duly

5   organized and existing under and by virtue of the laws of the State of California and

6   authorized to transact business in the State of California, with its headquarters in

7   Oakland, California.  Kaiser is not a licensed physician, and it is not authorized to

8   practice medicine in the State of California.

9          13.    The claims of the named plaintiff in this action were specifically

10  administered in this judicial district.  Thus, venue is proper in this judicial district

11  pursuant to 29 U.S.C. § 1132(e)(2) (special venue rules applicable to ERISA actions).

12                      **PRELIMINARY FACTUAL ALLEGATIONS**

13         14.    At all times relevant, Plaintiff Ian Moura and the members of the

14  proposed plaintiff class, as defined below (the "Plaintiff Class"), were covered by

15  health plans administered and/or underwritten by Kaiser which provided benefits for

16  medically necessary treatment of severe mental illnesses.

17         15.    Plaintiff and the members of the Plaintiff Class have (a) paid all premiums

18  they were required to pay under said health plans, (b) performed all obligations under

19  said plans on their part to be performed, and (c) complied with all requirements under

20  said plans, including appeal and/or grievance procedures that are deemed mandatory,

21  as well as provided all proper documentation regarding their claims.  Plaintiff and the

22  members of the Plaintiff Class have been diagnosed with the severe mental illnesses of

23  anorexia nervosa and/or bulimia nervosa.

24                          **Plaintiff's ERISA Plan**

25         16.    At all times relevant, Plaintiff Ian Moura was covered under a Kaiser

26  Permanente Deductible HMO Plan (the "Plan") issued to Nicholas Moura's employer,

27  Fujitsu Technology and Business of America, Inc.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17.     The Plan states that "A Service is Medically Necessary if it is medically appropriate and required to prevent, diagnose, or treat your condition or clinical symptoms in accord with generally accepted professional standards of practice that are consistent with a standard of care in the medical community."

18.     The Plan covers inpatient psychiatric hospitalization and intensive psychiatric treatment programs.

19.     The Plan also states the following:

Getting a Referral

Referrals to Plan Providers

A Plan Physician must refer you before you can receive care from specialists, such as specialists in surgery, orthopedists, cardiology, oncology, urology, dermatology, and physical, occupational, and speech therapies. . . .  However, you do not need a referral or prior authorization to receive most care from any of the following Plan Providers:

- Your personal Plan Physician
- Generals in internal medicine, pediatrics, and family practice
- Specialists in optometry, psychiatry, chemical dependency, and obstetrics/gynecology.

Although a referral or prior authorization is not required for most care from these providers, a referral may be required in the following situations:

• The provider may have to get prior authorization for certain Services in accord with "Medical Group authorization procedure for certain referrals" in this "Getting a Referral" section.

The provider may have to refer you to a specialist who has a clinical background related to your illness or condition.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

CLASS ACTION COMPLAINT

1   **Medical Group authorization procedure for certain referrals**

2   The following are examples of Services that require prior authorization by the Medical

3   Group for the Services to be covered ("prior authorization" means that the Medical

4   Group must approve the Services in advance):

5   • Durable medical equipment

6   • Ostomy and urological supplies

7   • Services not available from Plan Providers

8   • Transplants

9   Decisions regarding requests for authorization will be made only by licensed

10  physicians or other appropriately licensed medical professionals.

11      20.     Defendant's health plans do not identify Residential Treatment for eating

12  disorders as a service that requires prior authorization by the Medical Group.  Nor do

13  Defendant's health plans disclose that the patient's Plan Physician is not permitted to

14  refer or authorize Residential Treatment for eating disorders.  As a result, Kaiser

15  members who suffer from anorexia nervosa or bulimia nervosa are not advised, under

16  the terms of their health plans, that they must obtain this (undisclosed) additional level

17  of approval prior to receiving Residential Treatment Center care.  Similarly, patients

18  are not advised of the standards used by the Kaiser Medical Group for authorizing

19  Residential Treatment Center services.

20              **Mr. Moura's Eating Disorder and Requests for Treatment**

21      21.     Mr. Moura is a 29 year old man who suffered from anorexia nervosa.

22      22.     Mr. Moura was an anxious child. In fifth grade he changed schools and

23  had a hard time adjusting.  He did not fit in with the other kids at his new school, many

24  of whom had known each other since kindergarten, and he struggled to make friends.

25  When he started middle school, he only became more overwhelmed, not just with

26  social issues, but also with logistical details like changing classes multiple times a day

27  and having to keep track of different requirements from different teachers.  To cope, he

28  walked a lot after school to try to clear the sense of buzzing inside his head.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

CLASS ACTION COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

23.   In fifth grade, Mr. Moura's class had comprehensive sex education for the first time. He felt very awkward in the class because he had a profound sense that female puberty was not something that was supposed to happen to him. He tried to explain to a few adults in his life that he was a boy, not a girl, but he had a hard time conveying his feelings. He found the idea of female secondary sex characteristics profoundly distressing, so when a reading for sex education mentioned that female puberty involved a relative increase in body fat to prepare for the onset of menstruation, he decided that in order to prevent this outcome, he just would not gain any weight.

24.   Mr. Moura was a picky eater as a kid; there were a lot of foods he did not like because of the texture or the taste or smell, and he was not keen to try new things. He also did not have much of a sense of hunger, and if he was really wrapped up in something, like a book or a project, it was not unusual for him to forget to eat.  Since he played sports and walked a lot, his goal of "not gaining weight" was not especially difficult.  He did not think he was fat and was not concerned about whether or not other people thought he was, but he was deeply concerned about retaining the ability to be seen as a boy.

25.   For a number of years, Mr. Moura had a baseline level of disordered eating. He used hunger and activity to deal with things in his life that he could not otherwise control.  He could not change his anatomical sex, but he could change his physical shape to create a more androgynous appearance.

26.   Mr. Moura managed to stay relatively stable by staying close to home for college (and moving back home for a while after a rough start in the dorms for his first year).  In the spring of 2010, Mr. Moura began seeing Dr. Evelyn Hazlett at the Kaiser Fremont location for medication management and periodic assessment.

27.   From 2011 through 2013, Mr. Moura attended graduate school in Santa Cruz and saw a non-Kaiser therapist who specialized in eating disorders.

1

2

3

4

5

6

7

8

9

10

11

12

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.    By the end of 2013, Mr. Moura had lost a considerable amount of weight and was not eating solid foods.  He was surviving on liquid supplements providing 200-500 calories per day.  He was losing over 5 pounds per month.  His therapist stated that Mr. Moura needed to be in an inpatient treatment program and that she could not continue to treat Mr. Moura as his condition had become too severe.

29.    On January 13, 2014, Mr. Moura saw his primary care physician, Dr. Joyce Ann Viloria, at Kaiser Santa Clara, Department of Internal Medicine.   Multiple lab tests were performed to determine any medical consequences of his lack of adequate nutrition.

30.    On February 10, 2014, Mr. Moura saw Dr. Hazlett, who recommended psychiatric hospitalization.  However, Dr. Hazlett was unable to authorize hospitalization.

31.    On February 20, 2014, Mr. Moura returned to see Dr. Viloria.  Again, hospitalization was not approved.  Mr. Moura was referred for assessment to Kaiser in Campbell.

32.    Mr. Moura waited until March 14, 2014 for an appointment with Dr. Melody Baumgardner, an eating disorder specialist at Kaiser in Campbell, for a diagnostic evaluation to determine a course of treatment.

33.    On March 20, 2014, Mr. Moura went to an intake appointment at the Eating Disorder Intake Outpatient Program at Kaiser Redwood City.  He was evaluated by a therapist, dietician and nurse practitioner, who determined that he was not medically stable and sent him to the emergency room.  He was immediately hospitalized.  This was over 5 weeks after his Kaiser psychiatrist first recommended hospitalization.

34.    Mr. Moura remained in the hospital at Kaiser Redwood City from March 20, 2014 through April 4, 2014 for health complications resulting from his eating disorder.  By that time his condition had become so severe a feeding tube was required due to his inability to eat.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

35.     Upon his discharge from the hospital at Kaiser Redwood City, Mr. Moura was referred to Herrick Hospital (Alta Bates/Summit) in Berkeley.  He was admitted on April 7, 2014 when a bed became available.  He remained hospitalized until April 26, 2014.

36.     The usual course of treatment for patients with eating disorders after a hospitalization is to step down to residential treatment.  However, Kaiser did not send Mr. Moura to a residential treatment program after he was hospitalized at Herrick Hospital.  Instead, on April 28, 2014, Mr. Moura was admitted to Herrick's partial hospitalization program (PHP), which is a day treatment program, for eating disorders.  He was discharged on May 9, 2014 and referred to Kaiser Redwood City's Eating Disorder Intensive Outpatient Program.

37.     On May 12, 2014, Mr. Moura underwent an intake assessment at the Redwood City Eating Disorder Intensive Outpatient Program.  He was admitted to the program on May 13, 2014.  The program met three (3) times per week.

38.     On May 20, 2014, Mr. Moura was told to leave the Redwood City Eating Disorder Intensive Outpatient Program because he was unable to finish his meals within the time allotted and otherwise failed to meet the program requirements. Rather than recognizing that Mr. Moura was struggling with symptoms of his eating disorder, the staff proclaimed that he "didn't want to get better."

39.     Mr. Moura was discharged from the Redwood City program with no discharge plan, no case manager and no therapist.  He immediately began to lose weight.

40.     After multiple calls, Mr. Moura was able to find limited resources through Kaiser Santa Clara.  On June 16, 2014, Mr. Moura saw Smitha Rau, Psy.D, at Kaiser Santa Clara Psychiatry Department, who referred him to a dietician and an MD for outpatient treatment.

41.     On June 20, 2014, Mr. Moura saw Dr. Viloria for plantar fasciitis, caused by excessive exercise, a symptom of his eating disorder.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

42.     On June 27, 2014, Mr. Moura was first able to see Dr. Jan Kwong, a Kaiser doctor who specializes in eating disorder.  Dr. Kwong ran multiple lab tests and an EKG.

43.     Mr. Moura's first follow-up appoint with Dr. Rau was nearly one month after his initial appointment, on July 10, 2014. He had continued to lose weight.

44.     On July 15, 2014, Mr. Moura saw Dr. Hazlett.  Dr. Hazlett was extremely concerned about his medical stability.  It had been two months of weight loss and restriction since his discharge from the Herrick PHP program, with limited follow-up treatment from Kaiser.  Dr. Hazlett sent Mr. Moura to the emergency room to see if he was stable enough for psychiatric hospitalization.  Dr. Hazlett stated that Kaiser protocol did not allow her to order hospitalization.

45.     The emergency department checked Mr. Moura's electrolytes and sent him home with no referrals or follow-up care.

46.     On July 21, 2014, after further weight loss and inability to maintain an adequate diet, Mr. Moura sought readmission to Herrick Hospital.  Dr. Hazlett advised Mr. Moura to go to the emergency room and tell them that he had an eating disorder and needed psychiatric hospitalization.  Dr. Hazlett stated that this would be the best way to get a referral to Herrick Hospital.

47.     The attending mental health worker at the Kaiser emergency room did not know how to get a patient approved for hospitalization at Herrick but made several phone calls to try to find out.  He was told that there was a weekly conference on Thursdays to make such decisions.  Mr. Moura was told that he would hear from Kaiser after the next conference.  He was discharged with no referral or follow-up. No one called him after the Thursday conference.

48.     On July 28, 2014, Mr. Moura had his first meeting with Shannon Jordan, RD, the dietician in the Kaiser Santa Clara eating disorder program to whom he had been referred by Dr. Rau on June 16, 2014. Ms. Jordan told Mr. Moura that she was

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   unable to assist with meal planning for a patient whose eating disorder was as

2   advanced as his.  Mr. Moura was eating 50-100 calories per day at the time.

3        49.    Mr. Moura saw Dr. Rau again on July 31, 2014.  Unable to refer Mr.

4   Moura for hospitalization, Dr. Rau referred Mr. Moura to the Eating Disorder

5   Intensive Outpatient Program at Kaiser Walnut Creek.

6        50.    Mr. Moura had an intake appointment at Kaiser Walnut Creek with Dr.

7   Rachel Fields, Psy.D on August 5, 2014.  He was admitted to the program.  However,

8   the first three days he attended the program, he was not able to finish meals within

9   the allotted time, was told he could not stay and was sent home.  The staff determined

10  that Mr. Moura needed a higher level of care and that the matter was so urgent that

11  they did not wait for the regular Thursday meeting to arrange admittance to Herrick.

12       51.    On August 13, 2014, nearly one month after Dr. Hazlett first sought to

13  hospitalize him, Mr. Moura was admitted to Herrick Hospital.  He remained

14  hospitalized for over a month, until September 21, 2014.

15       52.    On September 22, 2014, Mr. Moura was admitted to Center for

16  Discovery in Fremont, a residential treatment facility for eating disorders.  Mr. Moura

17  left five days later.

18       53.    Mr. Moura continued to lose weight, eating only a few hundred calories

19  per day.  Unable to get adequate treatment from Kaiser, he sought help through

20  Stanford University's Eating Disorder Program.  He was given the name of an

21  outpatient therapist, who he saw on November 5, 2014 and November 10, 2014.  The

22  therapist said that Mr. Moura's condition was too severe for outpatient treatment, and

23  that residential treatment was the appropriate level of care.  The therapist gave Mr.

24  Moura a list of residential treatment centers that she recommended.  She said that she

25  would not recommend Center for Discovery.

26       54.    On November 18, 2014, Mr. Moura saw Dr. Hazlett, who referred him to

27  Charlene Laffaye, PhD., an eating disorder specialist at Kaiser Fremont.  Mr. Moura

28  saw Dr. Laffaye on November 26, 2014 and December 2, 2014.  Dr. Laffaye then

---

13

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   referred Mr. Moura back to Kaiser Santa Clara, even though he had not received

2   adequate treatment at that facility.

3       55.    Mr. Moura was then contacted by Kaiser Santa Clara to arrange an

4   appointment with Dr. Rau, but was advised that he could not get individual therapy

5   sessions more often than every 6-8 weeks.  Mr. Moura saw Dr. Rau on December 9,

6   2014, who referred him to a weekly Eating Disorder support group in Santa Clara, but

7   only with the stipulation that he would not lose any more weight before starting the

8   group in January 2015.  Mr. Moura was not given any support or referrals to maintain

9   his weight for the month preceding the support group.

10      56.    Mr. Moura saw Dr. Rau again on January 8, 2015 who confirmed that a

11  residential treatment center was the appropriate level of care for Mr. Moura.  Dr. Rau

12  agreed that, by his next appointment on February 9, 2015, she would solidify a plan

13  for him to start residential treatment and know how he would get there, working on

14  her own without Kaiser.  Dr. Rau provided the names of residential treatment

15  facilities that she felt were good programs and/or where she had patients who had

16  attended with good results.

17      57.    By January 8, 2015, Mr. Moura was physically weak and was suffering

18  from reduced cognitive functioning, memory problems, and an inability to

19  concentrate.  He attended the outpatient Eating Disorder Group but was the only

20  patient with anorexia.  Most of the patients were morbidly obese and the primary

21  focus of the group discussion was how to lose weight.  Mr. Moura discussed his

22  experience in the group with Dr. Rau, and they decided he should not continue to

23  attend.

24      58.     On February 9, 2015, Mr. Moura saw Dr. Rau and they discussed his

25  decision to seek admission to Monte Nido Eating Disorder Treatment Center.  Dr.

26  Rau agreed that this was the appropriate treatment plan given the severity of Mr.

27  Moura's eating disorder.  However, Dr. Rau said that she could not give Mr. Moura a

28  referral for residential treatment.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

59.     On the same day, Dr. Viloria conducted a physical and ordered labs required for admission to Monte Nido.

60.     On February 23, 2015, Mr. Moura went to the emergency room in Santa Clara with chest pains, falling down, numbness in his fingers and loss of fine motor control.  He was given electrolytes and discharged with instructions to see his regular doctor.

61.     On March 4, 2015, Mr. Moura began treatment at Monte Nido.  He discharged on April 26, 2015.  He paid approximately $75,000 for this treatment.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23.  This action has been brought and may properly be maintained as a class action under the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is ascertainable.

63.     Plaintiff seeks to represent a class composed of and defined as follows:

> All persons who were covered under an ERISA group health plan underwritten and/or administered by Kaiser which was issued, amended, or renewed in the State of California on or after July 1, 2000, who were diagnosed with anorexia nervosa or bulimia nervosa, (collectively "eating disorders") from inception of the applicable limitations period, including periods of tolling and estoppel, until the final termination of this action ("class period").

64.     The proposed class is limited to participants and beneficiaries of plans issued in California.  The proposed classes include only plans governed by ERISA. The proposed classes do not include Subscribers and Members of individual PPO plans and other non-ERISA plans.

1   65.   Plaintiff reserves his right to modify the definition of the proposed classes

2   based on information that he or his counsel learn through discovery.

3   66.   The Class and Subclass meet all of the requirements of Federal Rule of

4   Civil Procedure 23, as follows.

5   **Numerosity**

6   67.   The potential members of the proposed class as defined are so numerous

7   that joinder of all the members of the proposed class is impracticable. While the

8   precise number of proposed class members has not been determined at this time,

9   Plaintiffs are informed and believe that there is a substantial number of individuals

10   covered under Kaiser plans who have been similarly affected.  Numerosity of class

11   members will be ascertained and confirmed by discovery.  The number and identity of

12   the members of the class are readily determinable from the records of Defendant.

13   **Commonality**

14   68.   There are questions of law and fact common to the proposed class that

15   predominate over any questions affecting only the individual class members.  These

16   common questions of law and fact include, without limitation:

17   a)   Whether Kaiser breached the terms of its benefit plans and ERISA

18   by failing to pay plan benefits to Plaintiff and the Plaintiff Class

19   members;

20   b)   Whether Kaiser violated ERISA by violating the California Mental

21   Health Parity Act;

22   c)   Whether Kaiser violated ERISA by violating MHPAEA;

23   d)   Whether Kaiser violated ERISA by violating the Unruh Civil

24   Rights Act; and

25   e)   Whether Kaiser violated ERISA by violating the Corporate Practice

26   of Medicine Doctrine.

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

CLASS ACTION COMPLAINT

1

**Typicality**

2       69.    The claims of the named Plaintiff are typical of the claims of the proposed

3 class.  Plaintiff and all members of the proposed class sustained the same or similar

4 injuries arising out of and caused by Kaiser's common course of conduct in violation

5 of laws and regulations that have the force and effect of law.  Plaintiff's claims are

6 thereby representative of, and co-extensive with, the claims of the Plaintiff Class

7 members.

8

**Adequacy of Representation**

9       70.    Plaintiff will fairly and adequately represent and protect the interests of

10 the members of the proposed class.  There are no conflicts between the interests of the

11 Plaintiff and the other members of the proposed class.  Counsel representing Plaintiff

12 is competent and experienced in litigating class actions.

13

**Superiority of Class Action**

14       71.    A class action is superior to other available means for the fair and

15 efficient adjudication of this controversy.  Individual joinder of all proposed class

16 members is not practicable, and questions of law and fact common to the proposed

17 class predominate over any questions affecting only individual members of the

18 proposed class.  Each member of the proposed class has been damaged and is entitled

19 to recovery by reason of Kaiser's conduct.  They have little incentive, if any, to

20 prosecute their claims independently, and given their severe mental illness, would be

21 unlikely to find counsel to represent them.  The only practical mechanism is for them

22 to vindicate their rights in this instance through class treatment of their claims, which

23 is convenient, economical, consolidates all claims in a single suit, and serves to avoid a

24 multiplicity of suits.

25       72.    Kaiser has acted, or refused to act, on grounds that apply generally to the

26 class, so that final injunctive, statutory penalties, damages and/or declaratory relief is

27 appropriate respecting the class as a whole.  Class action treatment will allow those

28 similarly situated persons to litigate their claims in the manner that is most efficient

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17

1   and economical for the parties and the judicial system. Plaintiff is unaware of any

2   difficulties that are likely to be encountered in the management of this action that

3   would preclude its maintenance as a class action.

4                              **FIRST CLAIM FOR RELIEF**

5                        **(29 U.S.C. § 1132(a) (1) (B), (g))**

6          73.    Plaintiffs incorporate by reference the foregoing paragraphs as though

7   fully set forth herein.

8          74.    At all times relevant, Plaintiffs were beneficiaries of employee health

9   benefit plans administered and/or underwritten by Kaiser and governed by ERISA.

10         75.    Under the terms and conditions of the plans and applicable law, Kaiser

11  was required to pay for all medically necessary treatment of Plaintiffs for anorexia

12  nervosa or bulimia nervosa.  This includes medically necessary residential treatment.

13         76.    While covered under the plan, Plaintiffs became entitled to benefits under

14  the terms and conditions of the plans.  Specifically, Plaintiffs suffered from anorexia

15  nervosa or bulimia nervosa for which their treating providers determined treatment,

16  including but not limited to residential treatment, was medically necessary.

17         77.    Kaiser, through its unlawful Plan language and/or its policy of not

18  allowing Plan Physicians to authorize medically necessary residential treatment,

19  delayed, limited or denied Plaintiffs' claims for treatment.

20         78.    Plaintiffs performed all duties and obligations on their part to be

21  performed under the plans and/or were excused from compliance under the law.

22  Specifically, Plaintiffs were not required to ask for a referral or pre-authorization for

23  psychiatric treatment. Where, as here, ERISA plans violate the law, beneficiaries are

24  not required to exhaust administrative procedures.

25         79.    Kaiser's plans and its decision(s) regarding Plaintiffs' claims violate

26  ERISA, its implementing regulations, and the Federal and California Mental Health

27  Parity Acts.  Defendant further violated the Unruh Civil Rights Act and the Medical

28  Practices Act.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

CLASS ACTION COMPLAINT

80.     Kaiser's wrongful conduct has created uncertainty where none should exist.  Therefore, Plaintiffs are entitled to enforce their rights under the terms of the plans at issue and to clarify their rights to future benefits under such plans.

81.     As a proximate result of Kaiser's wrongful conduct, Plaintiffs seek payment of plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) in a total sum to be shown at the time of trial, including pre-judgment and post-judgment interest as permitted by law.

82.     Plaintiffs further seek payment of attorneys' costs and fees, which Plaintiffs are entitled to have paid by Kaiser.  29 U.S.C. § 1132(g) (1).

## SECOND CLAIM FOR RELIEF

### (29 U.S.C. § 1132(a) (1) (3), (g))

83.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

84.     As a direct and proximate result of the failure of Defendant to comply with the plan terms with regard to the request or benefits, Plaintiffs are entitled to and hereby request that this Court grant the following relief pursuant to 29 U.S.C. § 1132(a)(1)(B) and (a)(3):

a)      A declaration that Kaiser's plans violate ERISA by violating the Federal and California Mental Health Parity Act, the Unruh Civil Rights Act, and the California Medical Practices Act;

b)      A declaration that Kaiser's policy of not allowing Plan Physicians to refer patients with anorexia nervosa or bulimia nervosa to residential treatment violates ERISA by violating the Federal and California Mental Health Parity Act, the Unruh Civil Rights Act, and the California Medical Practices Act;

c)      A declaration that Kaiser's policy of not allowing Plan Physicians to authorize residential treatment for patients with anorexia nervosa or bulimia nervosa violates ERISA by violating the Federal and

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

19

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

California Mental Health Parity Act, the Unruh Civil Rights Act, and the California Medical Practices Act;

d)      Reformation of the plans to comply with ERISA and the Federal and California Mental Health Parity Acts;

e)      A mandatory injunction requiring Kaiser to pay benefits for medically necessary treatment of anorexia nervosa or  bulimia nervosa  for beneficiaries covered by California benefit plans; and

f)      Disgorgement of any profits Kaiser may have realized by virtue of its unlawful conduct.

85.      Plaintiffs further seek payment of attorneys' costs and fees, which Plaintiffs are entitled to have paid by Kaiser.  29 U.S.C. § 1132(g) (1).

## REQUEST FOR RELIEF

Wherefore, Plaintiffs pray for judgment against the Defendant, and that the judgment grant the following relief:

1.      Certification of this case and these claims for class treatment, with the class defined as set forth in this complaint;

2.      Designating Plaintiff Ian Moura as representative for the class;

3.      Designating Lisa Kantor, David Oswalt and Kathryn Trepinski as counsel for the class;

4.      Payment of benefits due to Plaintiff and other members of the class under the appropriate health care plan;

5.      For an order declaring that Kaiser's plans, which are used to deny medically necessary residential treatment for beneficiaries suffering from anorexia nervosa and bulimia nervosa and covered by California benefit plans, violate the law;

6.      A declaration that Kaiser's policy of not allowing Plan Physicians to refer patients with anorexia nervosa and bulimia nervosa  to residential treatment violates ERISA by violating the Federal and California Mental Health Parity Act, the Unruh Civil Rights Act, and the California Medical Practices Act;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

7.      A declaration that Kaiser's policy of not allowing Plan Physicians to authorize residential treatment for patients with anorexia nervosa and bulimia nervosa violates ERISA by violating the Federal and California Mental Health Parity Act, the Unruh Civil Rights Act, and the California Medical Practices Act;

7.      An injunction requiring Kaiser to pay benefits for treatment of anorexia nervosa and bulimia nervosa  covered by California benefit plans when such treatment is medically necessary notwithstanding any plan language that purports to exclude such treatment;

8.      Disgorgement of profits;

9.      Unruh Act payments and/or penalties;

10.     Payment of pre-judgment and post-judgment interest as allowed for under ERISA;

11.     Pursuant to 29 U.S.C. § 1132(g), payment of all costs and reasonable attorneys' fees incurred in pursuing this action; and

12.     For such other and further relief as the Court deems just and proper.

Dated:  May 1, 2017                    **KANTOR & KANTOR, LLP**

By:  _/s/ Lisa S. Kantor_____
Lisa S. Kantor,
Attorneys for Plaintiff,
Ian Moura, on behalf of himself and all others similarly situated

Dated:  May 1, 2017                    **LAW OFFICES OF KATHRYN M. TREPINSKI**

By:  _/s/ Kathryn M. Trepinski_____
Kathryn M. Trepinski
Attorneys for Plaintiff,
Ian Moura, on behalf of himself and all others similarly situated

*Filer's Attestation: Pursuant to Civil Local Rule 5-1(i)(3) regarding signatures, Lisa S. Kantor hereby attests that concurrence in the filing of this document and its content has been obtained by all signatories listed.*

CLASS ACTION COMPLAINT